Certiorari Denied, No. 31,864, August 20, 2009

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2009-NMCA-100

Filing Date: July 9, 2009

Docket No. 28,282

CARMEN ARIAS,

 Plaintiff/Counter-Defendant-Appellant,

v.

PHOENIX INDEMNITY INSURANCE COMPANY,

 Defendant/Counter-Plaintiff-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Ted C. Baca, District Judge**

Carter Law Firm, P.C.
Richard J. Valle
C.D. Carter, III
Albuquerque, NM

for Appellant

Law Offices of Bruce S. McDonald
Bruce S. McDonald
Albuquerque, NM

for Appellee

**OPINION**

**VIGIL, Judge.**

**{1}** This case presents yet another opportunity to address what constitutes a valid rejection of uninsured/underinsured motorist (UM/UIM) coverage under our Uninsured Motorist Act (UMA), NMSA 1978, §§ 66-5-301 to -303 (1978, as amended through 2003). The insured (Plaintiff) signed a rejection of such coverage as part of her initial application

1

for insurance, and a copy of the application was given to her at that time. However, since the application and rejection were not physically attached to the insurance policy that Plaintiff eventually received from the insurer, we conclude that the rejection was ineffective under an administrative regulation that requires the rejection of coverage to be made a part of the policy delivered to the insured. Accordingly, we reverse the district court order granting summary judgment in favor of the insurer to the extent that it relied on Plaintiff's ostensible rejection of UM/UIM coverage. We do not address the insurer's related offset and stacking arguments in favor of summary judgment because the district court should rule on those arguments in the first instance.

**BACKGROUND**

{2}     Plaintiff was involved in a motor vehicle accident with another motorist (the tortfeasor) and settled her claim against the tortfeasor for his policy limits of $25,000. Plaintiff then made a demand against her automotive policy, issued by Defendant, Phoenix Indemnity Insurance Co. (Phoenix Indemnity), for UM/UIM coverage. Phoenix Indemnity denied Plaintiff such coverage on the basis that Plaintiff had rejected UM/UIM coverage in her initial application for insurance. As a result of the denial, Plaintiff brought suit against Phoenix Indemnity, asserting that the tortfeasor's policy limits were inadequate compensation for her physical injuries sustained in the accident and seeking a declaratory judgment that she was entitled to UM/UIM coverage under her automobile insurance policy.

{3}     Phoenix Indemnity counterclaimed for a declaratory judgment and moved for summary judgment, asserting that Plaintiff had validly rejected UM/UIM coverage as part of the policy application process. In response, Plaintiff argued that the rejection in her application was legally ineffective because Phoenix Indemnity failed to include the rejection in the policy endorsements or to attach the rejection to her policy.

{4}     For purposes of the summary judgment proceedings, the parties stipulated to the following facts:  Plaintiff was involved in an automobile accident with the tortfeasor, presented a claim against the tortfeasor's insurance, and settled for the full amount of the tortfeasor's $25,000 liability coverage. At the time of the accident, Plaintiff was insured by Phoenix Indemnity and had two vehicles insured under her policy. Plaintiff's coverage under her policy began when she applied for the policy. As part of her application, Plaintiff indicated that she wanted to reject UM/UIM coverage and signed an agreement to delete such coverage. Plaintiff also signed an applicant's statement providing that "I have read this application and declare that all statements are true to the best of my knowledge and belief," and she was provided with a copy of her application at the conclusion of the application process. The application, and its signed agreement to delete UM/UIM coverage, was not physically attached to the insurance policy. Nor did the policy declarations page provided to Plaintiff contain any specific reference to her rejection of UM/UIM coverage.

{5}     At the conclusion of the summary judgment hearing, the district court announced its decision from the bench. Relying on the stipulations that Plaintiff, as part of her application,

2

signed an agreement to delete UM/UIM coverage and was given a copy of her application, the district court ruled that Plaintiff's rejection of UM/UIM coverage was valid. Plaintiff appeals from the subsequent written order granting summary judgment in favor of Phoenix Indemnity.

**DISCUSSION**

**Standard of Review**

**{6}** Summary judgment is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. On appeal, we review de novo the district court decision to grant summary judgment. *Rehders v. Allstate Ins. Co.*, 2006-NMCA-058, ¶ 12, 139 N.M. 536, 135 P.3d 237. We also review de novo questions of statutory construction. *State Farm Mut. Auto. Ins. Co. v. Luebbers*, 2005-NMCA-112, ¶ 6, 138 N.M. 289, 119 P.3d 169. As referenced above, in the present case, the parties stipulated to certain facts for purposes of the summary judgment proceedings. *See Haaland v. Baltzley*, 110 N.M. 585, 588, 798 P.2d 186, 189 (1990) (providing that stipulated facts are not reviewable on appeal). Consequently, our review is limited to examining whether the district court properly applied the law to such facts. *See Romero Excavation & Trucking, Inc. v. Bradley Constr., Inc.*, 1996-NMSC-010, ¶¶ 4-5, 121 N.M. 471, 913 P.2d 659.

**Requirements for a Valid Rejection of UM/UIM Motorist Coverage**

**{7}** In New Mexico, it is statutorily mandated that insurance companies include in automobile policies UM/UIM coverage ranging from the minimum statutory limits set forth in NMSA 1978, Section 66-5-215 (1983), and up to the limits of liability coverage contained in a policy. *See* § 66-5-301(A), (C). This requirement embodies a strong public policy "to expand insurance coverage and to protect individual members of the public against the hazard of culpable uninsured [and underinsured] motorists." *See Romero v. Dairyland Ins. Co.*, 111 N.M. 154, 156, 803 P.2d 243, 245 (1990). The legislative intent in requiring such coverage is to put the insured in the same position he or she would have been in if the tortfeasor had liability coverage equal to the UM/UIM protection as provided by the insured's policy. *See Morro v. Farmers Ins. Group*, 106 N.M. 669, 670, 748 P.2d 512, 513 (1988).

**{8}** An insured, however, may elect to reject UM/UIM coverage. *See* § 66-5-301(C). But to be effective, such rejection must satisfy the regulations promulgated by the superintendent of insurance. *See Kaiser v. DeCarrera*, 1996-NMSC-050, ¶ 8, 122 N.M. 221, 923 P.2d 588; *see also* § 66-5-301(A) (authorizing the superintendent of insurance to promulgate regulations governing UM/UIM coverage). The applicable regulation, 13.12.3.9 NMAC (11/30/01), provides:

> The rejection of the provisions covering damage caused by an uninsured or

3

unknown motor vehicle as required in writing by the provisions of Section 66-5-301 . . . must be endorsed, attached, stamped or otherwise made a part of the policy of bodily injury and property damage insurance.

**{9}** As stated in *Romero*, the purpose of the regulation is to ensure that an insured has affirmative evidence of the extent of coverage so that "[u]pon further reflection, consultation with other individuals, or merely after having an opportunity to review one's policy at home, an individual may well reconsider his or her rejection of uninsured motorist coverage." 111 N.M. at 156, 803 P.2d at 245. Furthermore, because rejection of UM/UIM coverage detracts from the public policy of providing reparation for those injured by uninsured and underinsured drivers, we liberally interpret the UM statute to implement the remedial purpose of protecting the insured. *See Chavez v. State Farm Mut. Auto. Ins. Co.*, 87 N.M. 327, 329, 533 P.2d 100, 102 (1975). Accordingly, any exception to UM/UIM coverage is construed strictly to protect the insured. *See Romero*, 111 N.M. at 156, 803 P.2d at 245.

**{10}** To this end, our Supreme Court has directed that a rejection of UM/UIM coverage is ineffective, regardless of the parties' intent, if it is not "endorsed, attached, stamped or otherwise made a part of the policy." *See Kaiser*, 1996-NMSC-050, ¶¶ 8, 10, 14 (holding that even though the insured had knowingly and intentionally signed a form rejecting UM/UIM coverage, such rejection was ineffective because the rejection was not included in the policy delivered to the insured). As such, Phoenix Indemnity's reliance on Plaintiff's purported knowledge that she rejected coverage in the application process is unavailing.

**{11}** We recognize there is some question whether the knowledge and intent of the parties may become relevant when the authenticity of the affirmative evidence of a rejection is challenged. *See Marckstadt v. Lockheed Martin Corp.*, 2008-NMCA-138, ¶¶ 21-24, 145 N.M. 90, 194 P.3d 121 (questioning the need for affirmative evidence of a rejection when "the insured maintains that he or she never doubted whether UM coverage had been rejected"), *cert. granted*, 2008-NMCERT-010, 145 N.M. 524, 201 P.3d 855; *see also Vigil v. Rio Grande Ins. of Santa Fe*, 1997-NMCA-124, ¶¶ 6, 24, 124 N.M. 324, 950 P.2d 297 ("[W]e decline to require an insurer to provide UM coverage in the face of clear evidence that the insured did not choose such coverage and knew it was not included in the policy."). In *Marckstadt* and *Vigil*, either an endorsement or declaration page was included with the insurance policy, and the question was whether the affirmative evidence of rejection needed to be signed by the named insured. Neither case detracts from the absolute regulatory requirement that any rejection must "be endorsed, attached, stamped or otherwise made a part of the policy." *See Romero*, 111 N.M. at 155, 803 P.2d at 244 (providing that "unless the named insured rejects such coverage in a manner consistent with the [regulation], [UM] coverage will be read into the . . . policy regardless of the intent of the parties or the fact that a premium has not been paid").

**Plaintiff's Rejection of UM/UIM Coverage Was Ineffective Because the Application and Its Included Rejection Were Not Attached to the Policy**

4

**{12}** The rejection of UM/UIM coverage can be made a part of the policy in a number of different ways. To the extent that Phoenix Indemnity relies on the application as affirmative evidence of the rejection, *Romero* presents closely analogous circumstances which inform our decision in this case. In *Romero*, even though the insured had signed an application indicating that she had rejected UM coverage, the Court held that the rejection was invalid because the application was not attached to or made a part of the policy. 111 N.M. at 157, 803 P.2d at 246. Similarly, in this case, Phoenix Indemnity's failure to attach the application to the policy is fatal to its claim that the rejection of UM/UIM coverage was made a part of the policy of insurance.

**{13}** In an attempt to distinguish *Romero*, Phoenix Indemnity points out that, unlike the insured in *Romero*, who was never given a copy of the application containing the rejection, Plaintiff stipulated that she received a copy of her application and its rejection. For this reason, Phoenix Indemnity argues that Plaintiff was provided adequate affirmative evidence of her rejection. However, as emphasized in *Romero*, 111 N.M. at 156-57, 803 P.2d at 245-46, the purpose of the requirement that any rejection be a part of the policy is to clearly and unambiguously call to the insured's attention that UM coverage has been waived and to provide the insured with affirmative evidence of the extent of her actual coverage. This ensures that the insured is well-informed about her decision, with the opportunity after further reflection to fully reconsider any rejection of UM coverage. A copy of an application and rejection, without the accompanying policy, deprives the insured of such an opportunity. Thus, the critical defect in *Romero* was that the application containing the rejection was not attached to the policy to allow such an opportunity, not that the insured did not receive a copy of the application and its included rejection when initially applying for insurance. *See Marckstadt*, 2008-NMCA-138, ¶ 13 (stating that "*Romero* clearly stands for the proposition that some affirmative evidence of rejection of UM/UIM coverage must be attached to an automobile liability policy in order for the rejection to be valid").

**A Provision in the Mandatory Financial Responsibility Act (MFRA) Defining the Contract Between the Insured and Insurer to Include the Application for Insurance Does Not Satisfy the Requirement That an Application Containing a Rejection of UM/UIM Coverage Must Be Attached to or Otherwise Made a Part of the Policy**

**{14}** Phoenix Indemnity argues that *Romero* is also distinguishable because of an amendment to the MFRA that was not in effect when *Romero* was decided. The 2003 amendment, NMSA 1978, Section 66-5-205.3(E)(4) (2003), provides that:

> the policy, declarations page, the written application and a rider or an endorsement that does not conflict with the provisions of the Mandatory Financial Responsibility Act constitute the entire contract between the parties.

Phoenix Indemnity argues that because the application and its included rejection are part of the entire contract between the parties, as provided by Section 66-5-205.3(E)(4), the

rejection in the application is necessarily "made a part of the policy" for purposes of satisfying 13.12.3.9 NMAC. We disagree.

**{15}** What constitutes the entire contract between the parties under the MFRA has no bearing on whether there has been a valid rejection of UM/UIM coverage under the UM Act. Put another way, Section 66-5-205.3(E) identifies the various documents that constitute the entire contract between the insured and insurer, but 13.12.3.9 NMAC provides the means by which the insured and insurer must include the rejection of UM/UIM coverage within their contract of insurance. Because the superintendent of insurance is expressly authorized by the UMA to promulgate the rules and regulations governing the rejection of UM/UIM coverage, *see* § 66-5-301(A), we decline to rely on a general definition of the contract of insurance within the MFRA as the basis for depriving Plaintiff of UM/UIM coverage in this case. *See Romero*, 111 N.M. at 156, 803 P.2d at 245 (noting that statutory language that would create an "exception to uninsured coverage should be construed strictly to protect the insured"); *see also Stinbrink v. Farmers Ins. Co.*, 111 N.M. 179, 182, 803 P.2d 664, 667 (1990) (providing that a statute dealing with a specific subject will be given effect over a more general statute).

**{16}** Moreover, as recognized in *Romero*, the administrative regulation requiring "that the rejection be made a part of the policy delivered to the insured quite apparently is to ensure that the insured has affirmative evidence of the extent of coverage." 111 N.M. at 156, 803 P.2d at 245. As such, we dismiss any suggestion that the Legislature intended to use the statutory definition of the contract between the insured and insurer under the MFRA as a means for ensuring that the insured has affirmative evidence that UM coverage was rejected. The affirmative evidence of rejection comes from ensuring that the insured receives a clear indication from the insurer upon receipt of the insurance policy that UM/UIM coverage was rejected—not from an obscure statutory reference that few insureds, if any, would know about. A statutory definition of the entire contract between the insured and insurer that includes the application does nothing to ensure that the insured is made aware of the lack of UM/UIM coverage upon receipt of the actual policy of insurance. *See id.* (recognizing that "after merely having an opportunity to review one's policy at home, an individual may well reconsider his or her rejection of uninsured motorist coverage" and that "[p]roviding affirmative evidence of the rejection of the coverage comports with a policy that any rejection of the coverage be knowingly and intelligently made"). At the very least, if the Legislature had wanted to change the manner in which a rejection of UM/UIM coverage is effectuated, we are confident the Legislature would have done so directly within the UMA itself. *Cf. New Mexicans for Free Enter. v. City of Santa Fe*, 2006-NMCA-007, ¶ 44, 138 N.M. 785, 126 P.3d 1149 (filed 2005) (stating that "[t]he [L]egislature clearly knows how to preempt local lawmaking when it wants to do so").

**{17}** Lastly, and importantly, as recognized in *State Farm Mut. Auto. Ins. Co. v. Progressive Speciality Ins. Co.*, 2001-NMCA-101, ¶¶ 8-9, 131 N.M. 304, 35 P.3d 309, the UMA and MFRA serve overlapping but different purposes. The MFRA is intended to protect the motoring public by requiring drivers to demonstrate a minimal amount of

6

financial responsibility as a condition for driving an automobile in this state. *Id.* ¶ 8. Despite the mandatory nature of the MFRA, the UMA is intended to protect drivers from others who are uninsured or underinsured by dictating that an insured be given the opportunity to insure fully against loss by putting the insured in the same position as if the culpable motorist had adequate liability insurance. However, while a driver cannot opt out of the requirements of the MFRA, that same driver is not compelled to secure the coverage afforded by the UMA. As such, we decline to sanction the use of a statutory provision within the MFRA, for which a driver cannot reject insurance coverage, as a means for effectuating the rejection of coverage under the UMA. *Cf. Padilla v. Dairyland Ins. Co.*, 109 N.M. 555, 558, 787 P.2d 835, 838 (1990) (holding that any provision allowing for an exception to UM coverage is construed strictly to protect the insured, with the result that "cases involving uninsured motorist coverage must be given a qualitatively different analysis by this court than cases which do not involve such coverage"). In short, had the Legislature intended to change the effect of regulation 13.12.3.9 NMAC, we believe that it would have implemented any changes within the UMA itself rather than within the statutory definition of an insurance contract for purposes of the MFRA. *See Maes v. Audubon Indem. Ins. Group*, 2007-NMSC-046, ¶ 11, 142 N.M. 235, 164 P.3d 934 (providing that a primary purpose of statutory construction is to ascertain and give effect to legislative intent, and for this reason, courts interpret statutes to facilitate their operation and the achievement of their goals).

**{18}**     Based on the foregoing discussion, we reverse the district court ruling that Plaintiff's rejection of UM/UIM coverage was effective and conclude that UM/UIM coverage must be deemed part of Plaintiff's liability policy. *See Kaiser*, 1996-NMSC-050, ¶ 6 (recognizing that UM/UIM coverage will be read into the insured's automobile insurance policy in the absence of a valid rejection); *Romero*, 111 N.M. at 156-57, 803 P.2d at 245-46 (providing that uninsured motorist coverage will be deemed part of an insured's liability policy when the rejection of such coverage does not satisfy statutory and regulatory requirements).

**On Remand, the District Court Must Decide in the First Instance Whether Plaintiff is Nevertheless Precluded From Recovering UIM Coverage**

**{19}**     Phoenix Indemnity also argues that Plaintiff is nevertheless precluded from any further recovery because a statutory offset is required for the $25,000 she already received from the tortfeasor's liability coverage. Further, Phoenix Indemnity argues that Plaintiff cannot stack coverage for the two vehicles insured under the UM/UIM coverage at issue in this case because Plaintiff intended to reject UM/UIM coverage, paid no premium for UM coverage, and therefore had no reasonable expectation of stacking UM/UIM coverage for the two vehicles insured under the policy. We decline, however, to address the availability of any offset or stacking because the district court did not rule on these arguments in the first instance. Although the potential impact of offset and stacking was raised in the summary judgment pleadings, it was not addressed at the summary judgment hearing, and the district court oral ruling addressed only the validity of the rejection.

7

**{20}** The district court did not consider whether Plaintiff was precluded from further recovery because of a statutory offset or the unavailability of stacking. Although both parties' briefs raise arguments on these two points that merit further study, we decline to address whether any offsets or stacking apply because the district court should be the first to rule on these matters. *See generally Garcia-Montoya v. State Treasurer's Office*, 2001-NMSC-003, ¶ 48, 130 N.M. 25, 16 P.3d 1084 (remanding for the district court to consider an issue in the first instance).

**CONCLUSION**

**{21}** We hold that Plaintiff's rejection of UM/UIM coverage was ineffective. The district court order granting summary judgment is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

**{22}    IT IS SO ORDERED.**

 

_____

**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Chief Judge**

_____

**LINDA M. VANZI, Judge**

Topic Index for *Arias v. Phoenix Indemnity Ins. Co.*, No. 28,282

| **AE** | **APPEAL AND ERROR** |
| AE-RM | Remand |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-SJ | Summary Judgment |
| | |
| **IN** | **INSURANCE** |
| IN-CV | Coverage |
| IN-MV | Motor Vehicle Insurance |
| IN-RI | Regulation of Insurance |
| IN-UM | Uninsured or Underinsured Motorist |